UNIVERSAL RIM COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 18963, 22693. Promulgated June 6, 1932.

*Nelson T. Hartson, Esq.*, and *Edward H. Hart, Esq.*, for the petitioner.

*L. A. Luce, Esq.*, and *F. L. Van Haaften, Esq.*, for the respondent.

**OPINION.**

MATTHEWS: Section 209 of the Revenue Act of 1917 provides:

That in the case of a trade or business having no invested capital or not more than a nominal capital there shall be levied, assessed, collected and paid, in addition to the taxes under existing law and under this Act, in lieu of the tax imposed by section two hundred and one, a tax equivalent to eight per centum of the net income of such trade or business in excess of the following deductions: In the case of a domestic corporation $3,000, and in the case of a

domestic partnership or a citizen or resident of the United States $6,000; in the case of all other trades or business, no deduction.

Section 200 of the Revenue Act of 1918 defines a personal service corporation as follows:

SEC. 200. That when used in this title—

*     *     *     *     *     *     *

The term "personal service corporation" means a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include any foreign corporation, nor any corporation 50 per centum or more of whose gross income consists either (1) of gains, profits or income derived from trading as a principal, or (2) of gains, profits, commissions, or other income, derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

The underlying purpose and intent of the provisions in the two acts are the same and it is incumbent upon the petitioner to show that for each of the taxable years the capital employed was incidental rather than substantial.

We have found that no cash was paid in at the time of the incorporation of the petitioner and that the entire capital stock in the amount of $100,000 par value was issued in equal amounts to Baker and Hawley in exchange for certain patents and patent applications and other property more particularly described in our findings of fact. We cannot say that the property turned over to petitioner by Baker and Hawley in exchange for the capital stock of the company was reasonably worth $100,000, but it is not necessary to determine its true value. We are of the opinion that the patents and the trade name "Universal" had some value at the time they were exchanged for the petitioner's capital stock. Although the patents originally assigned to the petitioner proved to be impractical, other patents were developed and improvements were being continually made, all of which related to demountable rim constructions. At the beginning of the taxable period petitioner owned more than thirty patents. The respondent has never determined the value of the patents for invested capital purposes, but this does not mean that petitioner had no invested capital.

Shortly after the company was organized an agreement was entered into between Baker and Hawley, who owned all the stock, and Walter S. Harris and T. Stewart Harris, whereby the Harris brothers agreed, in consideration of the issuance to them of 500 shares, or one-half of the capital stock of petitioner, to pay into the treasury of petitioner sums not to exceed $40,000, to be used in the development of petitioner's patents and in building up the business. About $33,000 was in fact advanced by the Harris brothers

for the purpose specified. This amount represents cash paid in to the corporation and it should be included in petitioner's invested capital. We do not know the amount of petitioner's invested capital, but the position that petitioner had no invested capital can not be sustained under the circumstances set out herein.

With respect to the question whether petitioner had more than a nominal capital, within the meaning of the statute, it may be remarked that it is not the amount of capital which is important, but rather whether it is capital in name only, that is, not substantial. The real issue is, did the earning power of the petitioner function independently of capital? This question is likewise pertinent in determining petitioner's tax liability for the years 1918, 1919 and 1920. Petitioner earnestly contends that its income for these years was attributable primarily to the activities of its stockholders and that capital was not a material income-producing factor. Failure to prove either of these contentions will be fatal to petitioner's right to be classified as a personal service corporation.

It is not disputed that the three stockholders of petitioner, Baker, Hawley and Anglada, were regularly engaged in the active conduct of the affairs of the corporation. We have stated that petitioner was the owner of a number of patents relating to demountable rim constructions and its essential business was developing and licensing these patents. Petitioner did not manufacture demountable rims and wheels, but entered into license agreements with manufacturing companies under which the licensees paid the petitioner 5 cents for each rim manufactured by them which used any device covered by any of petitioner's patents or patent applications. These license agreements specifically provided that the patents therein mentioned included any future patents which might be obtained or acquired by the petitioner. Mechanical improvements were made from time to time and new applications for patents were taken out by petitioner's stockholders, all of which applications and patents were assigned to the petitioner for the nominal consideration of $1 each. Petitioner paid the cost of obtaining these patents and bore the expenses incurred in experimentation and development work. Although the inventions differed in details of construction, they all dealt with carrying a spare tire inflated and ready for use upon a rim which could be mounted upon an automobile wheel in accordance with the practice which is now almost universal. The license agreements provided that the petitioner would furnish to the licensees, free of charge, at all reasonable times, service in a consulting capacity, the licensees to pay the traveling and other expenses in connection with such services where the expenses were incurred upon the request and specific authority

of the licensees. Baker kept in touch with all the licensees, calling on them personally at regular intervals, making suggestions and assisting them in their manufacturing operations. Reference is here made to our findings of fact for a more complete statement of the assistance rendered to the licensees in accordance with this provision.

The petitioner claims that the services of its stockholders were indispensable and that the patents were valueless without such service. It is suggested by petitioner that the licensees might have canceled their agreements and refused to make any payments if these services had been withheld.

There is no question that it was advantageous to petitioner to make improvements and to assist the licensees in their manufacturing operations because petitioner's income from the royalties was thereby increased. It was important also that the petitioner keep informed as to the manner in which the licensees were operating under the license agreements. These agreements expressly provided that the petitioner might audit the books and records of the licensees and inspect their demountable rim departments at all reasonable business hours and the licensees agreed to abide by all lawful restrictions which the petitioner might impose upon the manufacture and sale of the patented demountable rim constructions. The petitioner had the right to insist that the manufactured products come up to a certain standard. Baker testified that he paid all expenses incurred in connection with his visits to the licensees and that they never compensated him for the services furnished, so that these visits appear to have been made for purposes of inspection as well as to render any services which might be desired by the licensees. It is recognized, however, that, because of rapid changes in the wheel and rim industry, if the petitioner had not been ready and willing at all times to render this assistance, the license agreements would have become much less valuable as a source of income. The value to the petitioner of the license agreements was dependent upon the value of the patents and patent applications which covered the devices used by the licensees in the manufacture of the rims and wheels. It can not be doubted that the perfection of rim devices by the petitioner in the form of basic patents or patent applications and later improvements thereon were extremely valuable as producers of income. Unquestionably the services which the stockholders rendered to the licensees increased petitioner's good will and resulted in the payment of additional royalties, but we do not agree with the petitioner's contention that the petitioner's income was mainly ascribable to the activities of its stockholders. It follows that classification as a personal service corporation should be denied.

The development work and the engineering service which was furnished to the manufacturing companies necessitated the expenditure by petitioner of considerable amounts. In 1919 and in 1920 there were charged off on petitioner's books to experimental expenses the respective sums of $15,059.45 and $14,525.79.

On cross-examination Baker testified as follows:

Q. Where did you get the money to perfect your new patents and your new devices in 1917, 1918 and 1919; where did that money come from?

A. From our royalties.

Q. In other words, you put the royalties back into the business?

A. We put a great deal of it back into experimental work, and for service expense, and things of that kind. We never intended to put it back in the business, if we could possibly help it, because we wanted the dividends, if we could get them, and Mr. Hawley was more insistent on keeping them out than I was; and he mortgaged all he had to put into this service stock.

Q. Well, now, it cost you money to keep your business up during these years, didn't it? Say in 1918, 1919 and 1920, didn't it cost you money to keep your business up, to keep these devices up to the development of the trade?

A. It would necessarily cost money to do that. We couldn't make experiments, we couldn't go around and find out what was necessary to be done and do all of those things without money.

Q. In other words, you couldn't operate unless you had money coming in all of the time, could you?.

A. Money was necessary in the business.

He further testified that receipts from royalties, less operating expenses (which apparently included experimental and engineering expenses), were promptly distributed in the form of dividends and that petitioner did not maintain bank balances in any considerable amount. His testimony indicates that the expenses of carrying on experiments and of perfecting the patents and adapting them to the needs of the licensees, were treated in the same manner as the running expenses of the petitioner's business, such as office rent, so that many items of a capital nature appear to have been charged to expense.

From time to time the petitioner became involved in various interference proceedings and instituted suits for infringement of its patents. The profit and loss statement of petitioner for 1917 shows an item of $20,361.11 for legal expenses. The profit and loss statements for the years 1918, 1919, and 1920 show legal expenses in the respective sums of $5,021.38, $3,800.97, and $3,567.21. One of petitioner's witnesses testified that petitioner at one time received $75,000 in settlement of an infringement suit, but was not certain as to the date such amount was paid.

The petitioner's balance sheet for the year ended December 31, 1916, showed a surplus of $56,506.48.

Under these circumstances we hold that capital played an integral part in the actual production of petitioner's income and that peti-

tioner is not entitled to assessment under section 209 of the Revenue Act of 1917.

We have carefully considered the cases relied upon by petitioner, including the case of *DeLaski & Thropp Circular Woven Tire Co.* v. *Iredell*, 268 Fed. 377; affd., 290 Fed. 955, where the court held that the patents involved did not constitute capital. Without discussing the reasoning employed, we consider the facts to be distinguishable from those of the instant case and that the decision is not controlling herein. The court pointed out in the *DeLaski & Thropp Co.* case that the taxpayer's entire business was simply to collect and distribute the rental or royalty charged for the use of its patents. Its capital stock was reduced from $100,000 to $10,000 and in 1917 it had a surplus of only $2,000. In the instant case we have found that substantial amounts were expended by petitioner during the taxable years in developing patents and furnishing engineering service to the manufacturing companies. Petitioner's stockholders were constantly bending their energies to develop new ideas to succeed prior inventions as a competitive market rendered the old patents obsolete. We can not accept the proposition that the capital used was merely incidental to the earning power of the corporation. Cf. *Lincoln Chemical Co.* v. *Edwards*, 272 Fed. 142; affd., 289 Fed. 458; *Harvey Friction Spring Co.*, 11 B. T. A. 309.

In reaching this conclusion we have not considered the operation of the service station, which the petitioner claims was only incidental, having been established to furnish instruction in the operation of the devices covered by petitioner's patents. It is clear that capital was essential in operating the service station, which did repair work and kept on hand a stock of wheels and rims, but the petitioner urges that inasmuch as the service station was closed out as of April 30, 1917, after which time petitioner had no stock in trade and kept no inventories, petitioner should not be deprived of the right to assessment under section 209 of the Revenue Act of 1917. Petitioner has endeavored to separate on its books for 1917 the "service station" business from the "personal service" business. It is admitted that there was no actual separation on the books, but petitioner claims that the items are easily identifiable. Without passing upon the correctness of this method, we conclude that, irrespective of the operation of the service station, capital was a material factor in producing the income sought to be taxed herein. The determination of the respondent is sustained.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

TRAMMELL, ARUNDELL, McMAHON, and GOODRICH dissent.